## COMMONWEALTH vs. BENJAMIN F. RICKETSON.

By the 32d chapter of the revised statutes, every Boston pilot, who offers his services to the master of an inward bound vessel, before she has passed the line designated in § 24 of that chapter, is entitled to full fees of pilotage, whether his services are accepted or not.

Any master of a vessel may, in all cases, pilot his own vessel into Boston harbor, liable only to the payment of pilotage fees when a Boston pilot seasonably offers his services: But if no Boston pilot seasonably offer his services, the master may employ any other person to pilot his vessel in, and such person may do so, without incurring any penalty.

When a Boston pilot seasonably offers his services to the master of a vessel bound into Boston harbor, and the master of the vessel does not accept the services, but employs a person who is not authorized as a pilot for said harbor, to pilot his vessel in, the master thereby incurs no penalty ; but such person, by undertaking to pilot the vessel in, incurs the penalty imposed by the Rev. Sts. c. 32, § 23.

The payment of pilotage fees by a master of a vessel, who has declined an authorized pilot's seasonable offer of service and employed an unauthorized person to pilot the vessel in, is not the payment of a penalty, and is no bar to an indictment against such person for undertaking to pilot such vessel in.

The pilots, who are authorized to pilot vessels through the Vineyard Sound, over Nantucket Shoals, have no authority, by the Rev. Sts. c. 32, § 42, to pilot the same vessels into Boston harbor: And when one of them undertakes to pilot one of such vessels into that harbor, at the request of the master thereof, and is indicted for so doing, his warrant, as such pilot, is not admissible in evidence, in his defence, even for the purpose of showing that he was lawfully on board such vessel.

Under the Rev. Sts. c. 32, § 24, it is a sufficient offer of a pilot's services, in the night, to the master of a vessel bound into Boston harbor, if the pilot approaches such vessel and hails her, and makes all the tender which the time and circumstances permit, and his hail is heard on board, though it is not answered : It is not necessary, in such case, that there should be an actual offer to the master, and that he should have actual knowledge of such offer.

When an authorized pilot seasonably offers his services to the master of a vessel bound into Boston harbor, and the master, without requiring the pilot to show his warrant, declines to accept his services, and employs an unauthorized person to pilot his vessel in, and such person is indicted for undertaking to pilot her in, he cannot defend on the ground that there is no proof that the pilot had his warrant with him when he offered his services.

Depositions in perpetual remembrance, taken before an indictment is found, are not admissible on the trial of the indictment.

When a jury, after a cause is committed to them and they have gone out, return and make an inquiry of the court, as to a fact, it is within the discretionary power of the court to admit testimony respecting the matter of such inquiry.

A Boston pilot offered his services to S., the master of a vessel bound into Boston harbor, and S. did not accept them : The pilot subsequently claimed pilotage fees of S., and they both went before a commissioner of pilotage and submitted the claim to his decision : S. stated to the commissioner, that he was a stranger, &c., and that when he approached the harbor, he had a pilot on board whom he had paid : R. was afterwards indicted and tried for undertaking to pilot S.'s vessel into

the harbor; and on the trial, the statement made by S. to the commissioner was offered in evidence against R. *Held,* that it was inadmissible.

THE defendant was indicted and tried in the municipal court, at the December term thereof, 1842, for undertaking to pilot the barque Empress, a foreign vessel, into the port of Boston, on the 3d of April 1842, in violation of the provisions of the Rev. Sts. c. 32.

It was in evidence at the trial, that said barque was a foreign vessel, of 345 tons burthen, and had been chartered in New York, by B. P. Winslow, to come to Boston and thence to go to London. Three commissioned pilots for the port of Boston testified, that they hailed said barque, on the night of the 3d of said April, about four miles outside of the line mentioned in the Rev. Sts. c. 32, § 24 ; but that although the barque was within hailing distance and they could hear the creaking of her blocks, and from their position at the windward of her, they believed their hail must have been heard ; and although they followed her for some time and repeated the hail ; yet no answer was returned. Another Boston pilot testified, that the Empress came up, that night, in the wake of the Ranger, a barque which he was piloting in at the same time, and that she came to in the harbor of Boston within 300 rods of the Ranger, and was there at anchor on the next morning. Another Boston pilot testified, that the defendant boasted to him, some weeks afterwards, that he came to Boston in the barque Empress.

In the defence, and to show that the defendant was lawfully on board the Empress, he offered his warrant as a branch pilot for the coast of Martha's Vineyard and over Nantucket Shoals.

But the judge ruled it out ; being of opinion that it did not authorize the defendant to pilot the Empress into the harbor of Boston, when a Boston pilot had tendered his services. It was then stated by the defendant's counsel, that the warrant tended to prove that he was lawfully on board at the time. The judge remarked that if the defendant was on board the barque with the captain's consent, he was lawfully there.

The defendant contended that it was incumbent on the pilot, who tendered his services, to have his warrant with him at the

35 *

time. But the judge ruled, that as no answer was returned from the barque, and no warrant demanded, it was not necessary to prove that the pilot then had his warrant with him ; and that it was to be presumed, under the circumstances, that he would have shown his warrant, if demanded.

It was in evidence, that when the master of the Empress, captain Scott, was called upon in Boston for the pilotage fee, he refused to pay ; that he and a clerk of said B. P. Winslow then went with S. Colby, the pilot who demanded his fee, to Caleb Curtis, Esq., one of the commissioners of pilotage in the harbor of Boston, " and appealed to him whether the fee should be paid." The defendant objected to the admission in evidence of what took place and was said at that time, in his absence But the objection was overruled ; and it was testified, that captain Scott, on that occasion, said he was a stranger, and that on the night of said 3d of April he was below deck and had a pilot on board, to whom he had paid five dollars for the service. The commissioner decided that the pilotage was due, according to usage, but as the captain was a stranger and had paid five dollars, it would be hard to require him to pay it again ; and it was determined that the pilot's bill should be paid, deducting five dollars. It was accordingly so paid.

The defendant contended that the master of the vessel only was liable to the penalty mentioned in the Rev. Sts. *c.* 32, § 23. But the judge instructed the jury, " that when a master refuses the services of a pilot, duly tendered, and chooses to conduct his own vessel into port, he is entitled so to do, or to employ another person ; but that the pilot earns his full pilotage fee, by the tender, and is entitled to demand it : That this was not a penalty on the master, in its legal acceptation : That while the law secured to the master the right to pilot his own vessel, it gave the pilot the reasonable reward of his service : That though a master might lawfully refuse to employ a pilot who tendered his services, and might pilot his own vessel, it would not justify a third person, not having a warrant nor duly authorized, to undertake to pilot the vessel into the harbor : That such person would incur the penalty ; but the master would still be liable to

pay the full pilotage : And further ; that the payment of the pilotage by the master, under such circumstances, would be no bar to the penalty claimed of such unauthorized person."

The defendant contended that the pilot's offer of service must be an actual offer to the master of the vessel, who must have actual knowledge thereof, and that hailing the vessel was not sufficient. But the judge ruled, that if the jury believed that there was all the tender, in this case, which the time of night and the circumstances permitted, and that it was heard on board, although not answered, it was sufficient : And further ; that captain Scott should have been ready himself, or have appointed some other officer of the vessel, to answer the hail and to receive the pilot, if any offered.

The defendant offered in evidence the depositions of captain Scott and Stephen Larkin, master and mate of the Empress, taken *in perpetuam* before the finding of this indictment. These depositions were ruled out.

The judge finally instructed the jury, that if they believed, from the evidence, that the defendant did pilot in the Empress, as alleged in the indictment, they must find him guilty ; but if they were not satisfied of that fact, he was entitled to their verdict of acquittal.

After the jury had been out some time, they were permitted to return, and they inquired as to the fact whether the Empress had ever before been in the port of Boston. The judge thereupon remarked, that it was conformable to the practice of the court in such cases, to call the witness and to permit the jury to make any additional inquiry. The counsel for the defendant stated to the judge that they did not assent to the recalling of any witness. An officer was sent to call in B. P. Winslow, (who had chartered the Empress,) to answer the inquiry made by the jury. While the officer was gone, inquiry was made, on this point, of one of the pilot commissioners, who had been before examined as a witness, and he made certain statements rendering it probable that the Empress had never before been in Boston ; and when he was asked by the defendant's counsel whether he had previously testified as to that point, he declined a positive answer.

The judge then referred to his minutes, and told the jury tha it was proved on the trial, that the barque was a foreign vessel, and that captain Scott was a stranger in the port of Boston ; and that, in the absence of all evidence to show that either the captain or the vessel had ever been in Boston before, the jury nad a right to infer that they had not.

The jury found the defendant guilty. Whereupon the defendant alleged exceptions to all the foregoing opinions and rulings of the judge.

*J. M. O'Brien & Wellington*, for the defendant.

*Austin*, (Attorney General,) for the Commonwealth.

The opinion of the court was made known March 25th 1844.

SHAW, C. J. An indictment was found, in the municipal court, against the defendant, alleged to be an inhabitant of New Bedford, for a violation of the pilot laws regulating the pilotage of foreign vessels into the port of Boston. The general statement, to be gathered from the averments in the indictment, is, that the defendant, not being commissioned as a pilot for the port of Boston, did, in April 1842, pilot a foreign vessel, called the barque Empress, into Boston harbor, although certain regular Boston pilots offered their services before the vessel arrived at " a line drawn from Harding's Rocks to the Outer Graves, and from thence to Nahant Head," being the line fixed by law, (Rev. Sts. *c*. 32, § 24,) on the easterly or outside of whict the commissioned branch pilots must offer their services to inward bound vessels, in order to entitle themselves to their fees.

The first and by far the most important inquiry in the present case is, what is the true construction of the several provisions in the revised statutes ? Is there any apparent conflict in the different provisions ; and if so, how and upon what reasonable construction can they be reconciled ? These are questions not only deeply affecting the rights of a hardy and highly meritorious class of persons engaged in the public service, but also those of shipmasters and merchants, and through them the great interests of commerce and navigation.

Some general considerations may have their weight in enabling us to put a construction upon this law, before coming to

its precise provisions. It is obvious from the course of legislation upon this subject, that it has been, for a series of years, the wise policy of the law of this Commonwealth to provide for the employment of a body of men, as pilots, of competent skill and experience, to take charge of vessels both inward and out ward bound, so placed and in such numbers that their services can readily be commanded by those in need of them. The requisite skill and experience are insured by providing that they shall receive their authority by a public appointment, upon the recommendation of persons of established experience and skill themselves ; that they shall give bond for the faithful performance of the duties of their office, and be responsible for all losses occasioned by negligence, carelessness or want of skill. They are required (we speak of inward pilots) to cruise at a considerable distance off the coast, whenever the weather will permit, to be ready at once to offer their services to vessels that need their aid ; and it is obvious that the more boisterous the weather, the more their services are needed, especially by strangers. It is further the manifest policy of the law to encourage capable and responsible persons to undertake this laborious office, and faithfully to perform these meritorious and somewhat hazardous services, by securing to them the exclusive privilege of piloting vessels, and the enjoyment of the fees fixed by law. This exclusive right to take fees from all vessels to which their services are seasonably offered on the coast, whether accepted or not, and to take the fees fixed by law, which may seem large and perhaps somewhat extravagant for their services, when done by daylight, in fair weather and at a moderate season of the year, serves as a compensation to them for performing the same services in the darkness of night, in stormy weather, and at an inclement season. And considering the nature and importance of their services at all times, and the varying circumstances under which they must be performed, it seems that their exclusive privilege is fairly purchased by corresponding benefits to the public ; and therefore it is fit that it should be guarded by penalties upon those who would encroach upon it, and who have given no such guaranties to the public for skill, good conduct,

and faithful devotion, at all times, to this service. The fees are undoubtedly intended to be so graduated, that taking favorable and unfavorable times together, they shall form a reasonable compensation for the whole service.

There certainly appears to be some discrepancy between different provisions of the revised statutes ; but, as these constitute but one act, enacted and going into operation at the same time, it is the duty of the court so to construe them as to give effect to each clause, as far as practicable, and to pronounce no part void, unless they are so contradictory that the one or the other must yield.

The provisions of law, as they now stand in the revised statutes, consist of *general* provisions, apparently intended to apply to all ports and places within the jurisdiction of the State ; and *special* regulations, adapted to pilotage into the ports of Boston, Salem, Newburyport, New Bedford and Fairhaven, and through the Vineyard Sound and over Nantucket Shoals. In the *general* provisions, Rev. Sts. c. 32, § 12, it is declared, that any master of a vessel, (other than fishing vessels, &c., excepted in § 7,) " who may choose to pilot his own vessel into or out of any port, shall be permitted to do so ; but he shall, notwithstanding, be liable to pay to such pilot of the port as shall first come on board of his vessel, the full pilotage according to the fees specified in his warrant."

In the *special* provisions regulating pilotage for Boston harbor, (§ 23,) it is declared, that "if any person, not having a branch, commission or warrant, as a pilot or pilot's apprentice, for the harbor of Boston, shall undertake to pilot into or out of said harbor any vessels, excepting such as are excepted in § 7, he shall forfeit a sum not exceeding $ 50 for each offence." This is the section upon which the present prosecution is founded.

The next section, § 24, declares, that " in case no Boston branch pilot shall offer his services to the master of a vessel bound into the harbor of Boston, before the vessel shall have passed a line drawn from Harding's Rocks to the Outer Graves, and from thence to Nahant Head, such master shall be at lib-

erty to pilot his own vessel, or to employ any other person to pilot his vessel into the said harbor, without incurring the penalty mentioned in the preceding section."

If these two last sections stood alone, it would seem very manifest, that the 23d section, imposing the penalty upon *any person*, without exception, who should undertake to pilot a vessel in, would include the master, as well as any other person. And this construction would seem to be strengthened by the 24th section, declaring that if no Boston pilot seasonably offer, the master shall be at liberty to pilot his own vessel, or to employ any other person, *without incurring the penalty;* implying that he would incur the penalty by piloting his own vessel, or employing another, if a Boston pilot had seasonably offered. But this is irreconcilable with the 12th section above cited, which provides, that if a master chooses to pilot his own vessel, he may do so, paying the regular fees, as if a regular pilot were in fact employed. If he is permitted to pilot his own vessel, then it is not unlawful; he commits no offence, and incurs no penalty. The liability to pay the fees, in such case, is a compensation for services tendered, and not a penalty. Apparently contradictory as these provisions are, they are to be reconciled, if possible, by a reasonable construction.

One obvious remark, common to this and other parts of the revised statutes, is this; that although, as positive law, they all took effect at the same time, yet they were, in most instances, revisions of former acts made at different times; that is, the re-enactment of former acts, with some modifications. When statutes are passed at different times, with conflicting provisions, the later repeals the prior, without any repealing words; because the last formal and constitutional expression of the legislative will is the governing law. This rule cannot apply to earlier and later sections in the revised statutes, for the reason already alluded to, viz. that although earlier or later in the order in which they are placed in the statute, they were all enacted simultaneously, and no one repeals another. But as they were taken from statutes passed at different times, it may in some manner account for the use of terms apparently contradictory

The first act, it is believed, under the constitution, was *St.* 1783, *c.* 13, "for regulating pilotage in several ports of this Commonwealth." It recited that frequent and heavy losses had been sustained, and navigation greatly injured, for want of a well regulated pilotage. It provided for the appointment of pilots by the governor and council; required them to take an oath and give bond; assigned their districts, regulated their fees, and subjected them to responsibility for losses, with various regulations. Sect. 6th provided that any master of a vessel, who might choose to hazard the pilotage of his own vessel into any port, should be at liberty to do so, subject to the payment of one half the regular fees to the first pilot who should come on board; and it gave such pilot an action to recover the amount. Sect. 7th provided, that if no regular pilot should offer before a vessel had arrived within certain limits, and the master should then decline taking a pilot, he should be exempt from any fees of pilotage. This plainly implied, that if the offer was seasonably made, the master was liable for half the fees, whether he accepted the offer or not. This, it is believed, is all the provision then made to insure to the regular pilots the exclusive right to pilot vessels in, and take their fees. No penalty was imposed on any unauthorized person. It was probably considered sufficient to secure the exclusive privilege to the regular pilots, that fees were to be paid if their services were tendered, whether accepted or not.

This statute, it is believed, with some slight modifications, constituted the basis of the law on the subject of pilotage, until 1829, when an act was passed specially regulating the subject of pilotage for the harbor of Boston. *St.* 1829, *c.* 2. The 1st section of this act prohibited any person from undertaking to pilot any vessels (except fishing vessels, &c.) into the harbor of Boston, without having first obtained a commission, under a penalty of $ 50; with a proviso in § 4, that if no Boston pilot should offer his services, &c., such master should be at liberty to pilot his own vessel, or employ any other person to pilot it into Boston harbor, without incurring the penalties of the act. This act made further provisions as to the appointment of pilots, and repealed all laws inconsistent with its provisions.

Here we perceive the origin of §§ 23 and 24 of the 32d chapter of revised statutes. It had probably been ascertained, by some experience, that unauthorized persons, either by misrepresenting themselves to strangers, or otherwise, were in the habit of interfering in the business, to the injury of the regular pilots, and that it had become necessary to restrain them by a penalty. This difference between the case of Boston and the other ports was probably occasioned by the fact, that the navigation of this city being so much larger than that of any other port in the State, the temptation to violate the law was greater.

But the remark upon this statute most material to the pres· ent case is this ; that as it imposed a penalty of $50 upon *any person*, not a commissioned pilot ; as there was no clause — as in the *St.* of 1783 — authorizing a master to pilot his own vessel ;.and as this act repealed all prior inconsistent acts ; we are strongly inclined to the opinion, that as the law then stood, the master would have incurred the penalty by undertaking to pilot his own vessel.

An additional act was passed in 1835, providing for the mode of appointing pilots, the securities to be taken of them, regulating their fees, and providing also for the appointment of pilot commissioners having a superintending jurisdiction on the subject, but not changing the law as to the right of the master to pilot his own vessel, nor as to his liability, or that of any other person, to the penalty provided in the act of 1829. *St.* 1835, c. 149.

Thus stood the law, when the revised statutes were passed ; and we are again brought back to the question, how § 12 of *c.* 32, making it lawful, in all cases, for a master to pilot his own vessel, can be reconciled with §§ 23 and 24, imposing a penalty upon " any person," and with an implication which seems so to extend this prohibition as to include the master.

We have no doubt that it was the intention of the legislature, in the revised statutes, to reënact that provision of *St.* 1783, which made it lawful for a master to pilot his own vessel — with this alteration, that instead of paying half the fees of pilotage in that case, he should pay the full fees ; thereby taking

away all temptation to employ unauthorized persons, or to undertake to pilot his own vessel.   In either case, he would save nothing.

The only question upon this point of the case was, whether this particular provision included the harbor of Boston, or only the other ports of the State, not extending the same liberty to masters coming into the port of Boston, to pilot their own vessels, even on paying full pilotage.

As there seemed to be a distinct series of regulations for Boston, and as there were several other ports to which the other general regulations applied, and as these were manifestly the revision of acts passed at different times, the former for the State at large, and the latter for Boston, we were at first inclined to take this view of it.   But upon further consideration, we are of opinion, that this construction is not the true one.   The 12th section is general in its terms ; there is nothing in the words to show that it was not intended to apply to Boston ; and we think it would be too narrow and forced a construction to hold, without such terms of restriction, that it does not include the port of Boston.

Considering both provisions, then, as reënacted and in force, both having been passed at the same time, we are of opinion, that the true construction is this :   By § 12, a master may always pilot in his own vessel, being liable always to pay the full pilotage.   But this liability for pilotage is not regarded as a penalty, but rather as a compensation to which the regular pilot is entitled, for services tendered, and of which the master might have availed himself, if he wished.   It follows, therefore, that a master can never incur the penalty of $ 50.   But this privilege is a personal one to the master himself, and he cannot, under color of such personal right, authorize a person, not commissioned as a pilot, to pilot in a vessel, without incurring a penalty.   Indeed, to hold that he could, would be in effect a repeal of the law.   For as no person, seaman, passenger, branch pilot of another station, or other person, can pilot a vessel in, without being authorized or permitted so to do by the master, the penalty could never be incurred by any person.

Then comes the 23d section, which imposes a penalty upon " any person " not having a branch, commission or warrant, for undertaking to pilot in, &c. This clause, if it stood alone, by *any person*, would include the master. But it does not stand alone. It is part of the same statute which authorizes the master, as a personal privilege, to pilot his vessel in. The words *any person*, then, must be necessarily taken to mean, " any person except the master personally." It will operate, as we think it was intended to operate, to deter all unauthorized persons from professing and undertaking to act as pilots, either for compensation below the regular pilotage fees, or otherwise. It will include persons boarding the vessel from boats, and pretending to be commissioned pilots — and thus deceiving strangers — and prohibit subordinate officers, or seamen, or passengers, or branch pilots from other stations, not commissioned for this port, from undertaking to act as pilots ; of which their actually piloting the vessel in, and especially taking any fee or compensation, as pilotage or as a gratuity, would be very strong evidence.

There is some difficulty in reconciling the phraseology of the 24th section with this construction. It is, that if " no Boston branch pilot shall offer his services to the master of a vessel bound into the harbor of Boston, such master shall be at liberty to pilot his own vessel, or to employ any other person to pilot his vessel into said harbor, without incurring the penalty mentioned in the preceding section ; " that is, the penalty of $ 50.

It was urged at the argument, that this latter clause implies, that the penalty of the preceding section is incurred by the master, and not by the party undertaking to pilot. But this is not only contrary to what we understand to be the policy of the act, but contrary to the express words, which impose the penalty upon the person undertaking, not upon the master employing him. Then the intent of the 24th section is, that if a Boston branch pilot does not seasonably offer his services, the master may pilot in the vessel himself ; but as this had been provided for before, it adds no new power ; and the phrase was probably retained through inadvertence, by being copied from another statute, where, as we have before seen, it had a meaning. But

the alternative provision is, that he may employ any other per-
son, without incurring the penalty. Now if he may lawfully
employ any other person, such person may be lawfully employ-
ed, and will therefore commit no offence, and incur no penalty.
If we are right in the former construction, the master would
incur no penalty, for none is imposed on him, either for piloting
in his own vessel, or employing another to do so ; because his
liability to pay the regular pilotage is not a penalty at all, and
the penalty mentioned in this section is the penalty of $50
The only meaning, therefore, and the necessary construction is,
that the master may employ any other person, without his (that
is, such person's) incurring the penalty. This is not the strict
grammatical construction, but it is the rational, and we think the
legal construction, and reconciles the different provisions of the
revised statutes with each other. Taking the whole together,
then, the result will be this : Every Boston pilot, who shall offer
his services to an inward bound vessel of the class mentioned,
before she shall have arrived at the line designated, will be en-
titled to his full fees, whether his services are accepted or not.
Every master may personally pilot his own vessel in, liable only
to the payment of fees of pilotage. If no Boston pilot offer
before the vessel arrives at the line, then the master may do the
same thing without paying any fee. But if such offer have been
made, no unauthorized person shall undertake to pilot a vessel
in, whether falsely representing himself to be a pilot or not, or
whether employed by the master or not, under a penalty of
$50. If, however, no branch pilot offer before the vessel has
arrived at the line designated, then the master may employ any
other person, at his pleasure, and such person may lawfully pilot
the vessel in, without committing any offence, or incurring any
penalty.

This view of the law disposes of the principal exception tak-
en to the decision of the judge of the municipal court, and his
instruction to the jury. This exception was as follows : " The
defendant contended, that the master of the vessel only was liable
to the penalty mentioned in the Rev. Sts. c. 32, § 23. But the
judge instructed the jury," &c. [Here the chief justice recited the

instruction, as fully set forth, *ante*, 414.]   This instruction, we think, for the reasons already given, was correct in matter of law, and open to no exception.   This extends to both points, viz. that the master, by employing an unauthorized person, did not incur the penalty ; that the unauthorized person himself did incur the penalty, and that the payment of pilotage by the master was no bar.

Several other exceptions were taken, which we will consider in their order.

1. It is objected that the warrant of the defendant, as a pilot in the Vineyard Sound and over Nantucket Shoals, which was offered in evidence, was improperly rejected.   It is, we think, very clear, that such warrant gave him no authority to pilot a vessel into Boston harbor.

There is a provision in Rev. Sts. *c.* 32, § 42, which, if it stood alone, and hastily read, might seem to imply such an authority. The provision is, that " any person who shall faithfully and skilfully pilot any vessel through the Vineyard Sound over Nantucket Shoals, to her port of destination in Boston Bay, or eastward thereof, shall be entitled " to certain fees specified ; with a proviso, that it shall not extend to any case where a different agreement is made.   Taken in connexion with the other provisions of this chapter, it is obvious that this section, which was revised from a special act passed in 1820, (*St.* 1819, *c.* 155,) was intended to regulate pilotage over the shoals into Boston Bay or eastward thereof, and not to pilot vessels into Boston harbor, or any other harbor in the bay.   Any other construction would be repugnant to the general terms of the act, which pro vides, § 8, for the assignment of districts to the several pilots ; § 7, which authorizes each pilot to take charge of any vessel, bound into the port assigned to him ; and § 23, which prohibits any person " not having a branch commission or warrant, as a pilot or pilot's apprentice for the harbor of Boston."

If then the defendant had any warrant as a Vineyard pilot, it had no tendency to excuse him, and any argument to that effect, founded on it, could only tend to mislead the jury.   Indeed, it was not avowedly offered for that purpose, but to prove that the

36 *

defendant was lawfully on board. As the judge very properly remarked, it was not necessary for that purpose, as it was to be presumed, if he was on board with the consent of the master, that he was lawfully on board. In truth that fact was not contested, and if it had been, his commission, as pilot, had no tendency to prove it, without proof that he had been employed as pilot to bring the vessel over the shoals ; and such proof would have been as efficacious for that purpose, without the warrant as with. If he was lawfully employed at an anterior stage of the voyage, that employment had ceased when the vessel reached the Boston pilot ground ; and he was then on board as a passenger coming to port on his way home, because he could not be landed sooner. We think that evidence was very properly rejected.

2. The next objection is, that the regular pilot, who offered his services, should have proved affirmatively, that he had his warrant with him. The provision of Rev. Sts. c. 32, § 7, which authorizes the regular pilot to take charge of every inward bound vessel, of a certain description, adds, " the said pilot first showing his warrant to the master, *if required.*" The first act, imposing on him the duty of exhibiting his warrant, was to be done by the master in requiring it ; and until that was done, he was in no default in not showing it ; and the master had no right, on that pretence, to reject his services and employ an unauthorized person. Proof that he had it with him, therefore, was not necessary, to prove the act of the defendant unlawful, and charge him with the penalty.

3. The next exception was to the admission of statements and declarations made by captain Scott, in the absence of the defendant ; which evidence was objected to at the trial. This exception appears to us to be well taken, and must be sustained. We can perceive no ground, on which this can be taken out of the rule, which excludes hearsay testimony. One ground of exception from the general rule, urged by the Attorney General, was, that this was evidence of what took place before the pilot commissioners, or one of them, and that they had by law a summary jurisdiction on the subject of pilots and pilotage.

But the answer we think is, that they had no jurisdiction over the subject of the penalty, no authority to enforce it, or remit it, or receive satisfaction for it. The object of going before the commissioners was to obtain the pilotage fees of the master for the pilot who was entitled to them. The two proceedings were instituted and conducted *alio intuitu*, against different parties, and for different purposes. The commissioners did not profess to act at all on the subject of the penalty, but only on the subject of pilotage. Another answer to the objection was, that the declarations of the master were wholly immaterial, and could have had no influence on the jury. But we cannot so consider it. The declaration of captain Scott before the commissioner, when he was called on for the pilotage and objected to paying it, was, that he was a stranger, and was below, and had a pilot on board at the time, to whom he had paid five dollars. Now if proved *aliunde*, as we may presume it was, that the defendant was that pilot, the words appear to us to be very significant. They show that the defendant in fact piloted the vessel in, if he did not even do it under color of his office as pilot on another part of the coast, and so deceived captain Scott, as to his authority ; and what is very essential, that he, captain Scott, paid, and of course that the defendant received, five dollars for the service. We are of opinion that this evidence should not have been admitted.

4, 5, 7. These exceptions have been already answered ; viz. that the master only incurred the penalty ; that payment of the pilotage by the master was a satisfaction of the penalty due from the defendant ; and that the Commonwealth was estopped from claiming the penalty. We think they are all wholly untenable. The commissioner did not act or profess to act for the Commonwealth, nor do any thing in relation to the liability of the defendant for the penalty.

6. The sixth exception was, that the depositions of captain Scott and Stephen Larkin, taken *in perpetuam*, before the indictment was found, ought to have been received in evidence.

Before the passing of the revised statutes, it was a well established rule of evidence in criminal cases, that all testimony, on

both sides, must be *viva voce* at the trial, unless admitted other-wise by express consent. · By the Rev. Sts. *c.* 136, § 32, it is provided, that when issue shall be joined on an indictment, the court may, on the application of the defendant, issue a com-mission to take depositions. These depositions, taken before the indictment was found, are clearly not within this provision of the statute, and being otherwise inadmissible by law, we think they were rightly rejected.

8. The next exception is to the ruling .and instruction of the judge as to the ground taken by the defendant, that the offer of services must be an actual offer to the master, and that he must have actual knowledge thereof ; and that hailing the vessel was not sufficient. [The ruling and instruction were recited by the chief justice, as they are stated, *ante*, 415.] We are of opin-ion that this instruction was correct in all particulars. When the statute speaks of an offer of services by a pilot at sea, it refers to the subject matter for its construction. A nautical communication must be made in nautical language, a language probably as well understood by nautical persons of all languages, engaged in navigation, as any technical language of the law in this court. The exception implies that if the master of a vessel on the coast, under sail at midnight, chooses to keep his cabin, and direct no person to answer a hail, it will be the duty of a pilot to run along side the vessel, under full sail, to go on board and present himself to the master, and offer his services — a thing we suppose manifestly impossible. As to the other part of this instruction, to which objection was taken in the argument, in reference to the duty of the master, we think it was also correct.

A vessel on the coast, inward bound, and under sail, must be presumed to have, and if properly managed must have men on deck, who, in the absence of the master below, must stand in his place and be under his orders ; and therefore the judge was right in saying that it is the duty of the master to be on deck, or to have some officer or person in charge of the watch, to do duty in his absence, and either to answer a hail rightfully made, or immediately inform him of the fact. We think therefore the

only question was one of fact, rightly left to the jury, whether the pilot boat was so near and in such a position, that the hail was, or might, if the officers and crew had been on duty, have been heard on board the barque ; and if it was, that this was a sufficient offer and tender of services.

9. An objection was taken to the course of the judge at the trial, in admitting testimony after the jury had been out. We think it was a matter depending wholly on the discretion of the court. The order of receiving evidence is adopted for convenience, and may be varied, according to particular circumstances. As to the objection to the recapitulation of the evidence of the declarations of captain Scott, the same objection lies to it, as to the admission of that testimony, and no other.

We are of opinion that all the exceptions, except that, must be overruled ; but on account of the admission of that evidence, the verdict must be set aside and a new trial granted. And the case will be remanded to the municipal court, for that purpose.